**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| PROJECT FOR PRIVACY AND | : | | |
| SURVEILLANCE ACCOUNTABILITY, INC., | : | | |
| | : | | |
| Plaintiff, | : | | |
| | : | Civil Action No.: | 24-1940 (RC) |
| v. | : | | |
| | : | Re Document Nos.: | 16, 18 |
| UNITED STATES DEPARTMENT | : | | |
| OF JUSTICE, | : | | |
| | : | | |
| Defendant. | : | | |

**<u>MEMORANDUM OPINION</u>**

GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; AND DENYING PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

In February 2024, Plaintiff Project for Privacy and Surveillance Accountability, Inc.

("PPSA") submitted a Freedom of Information Act ("FOIA") request to the FBI seeking records

discussing the use of authority under the Foreign Intelligence Surveillance Act ("FISA") to

investigate attendees of President Trump's Save America Rally and multiple Black Lives Matter

events in Washington, D.C. in 2021.  The FBI denied the request.  After appealing the decision

to the Department of Justice ("DOJ") Office of Information Policy ("OIP"), PPSA filed this suit

in July 2024, alleging a single count of a violation of FOIA, 5 U.S.C. § 552.  In response, the

FBI has refused to confirm or deny the existence of the requested records, and invoked FOIA

Exemptions 1, 3, and 7(E).  The parties have cross-moved for summary judgment.  For the

reasons stated below, the Court grants Defendant's motion, and denies PPSA's cross-motion,

because the FBI's response was justified under FOIA Exemptions 1 and 3.

## II.  BACKGROUND

PPSA is a non-profit organization that "advocates for greater privacy and civil liberty protections from government surveillance."  Compl. ¶ 7, ECF No. 1.  As relevant here, PPSA is interested in learning "the extent to which U.S. law enforcement and intelligence agencies have relied on Section 702 of the Foreign Intelligence Surveillance Act ("FISA") to engage in politically motivated surveillance."  *Id.* ¶ 2.  According to the FBI, "Section 702 is a key provision of the FISA Amendments Act of 2008 that permits the government to conduct targeted surveillance of foreign persons located outside the United States, with the compelled assistance of electronic communication service providers, to acquire foreign intelligence information."  *Foreign Intelligence Surveillance Act (FISA) and Section 702*, FBI, https://www.fbi.gov/how-we-investigate/intelligence/foreign-intelligence-surveillance-act-fisa-and-section-702 (last visited Nov. 20, 2025); *see* 50 U.S.C. § 1881a(b).  But intelligence information on U.S. citizens can unintentionally be collected using Section 702 authority.  *See* 50 U.S.C. § 1881a(b); *Project for Priv. & Surveillance Accountability, Inc. v. U.S. Dep't of Just.* ("*PPSA IV*"), 143 F.4th 506, 510 (D.C. Cir. 2025).  "When that happens, agencies must employ procedures to 'minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information[.]'"  *PPSA IV*, 143 F.4th at 510 (quoting 50 U.S.C. § 1801(h)(1)).

Even so, PPSA is concerned that the use of Section 702 for politically motivated surveillance may jeopardize individuals' First Amendment rights.  *See* Compl. Ex. 1, ECF No. 1-1.  To that end, in February 2024 PPSA submitted a FOIA request to the FBI seeking:

> 1. All records discussing the use of Section 702 or other FISA authority to surveil, collect information related to, or otherwise investigate any person or group of persons listed below:
>   - Attendees of President Trump's "Save America Rally" on January 6, 2021;
>   - Attendees at Black Lives Matter protests or other Black Lives Matter events in Washington, D.C. in 2021.

*Id.* PPSA "clarified that it seeks records created, altered, sent, or received between January 1, 2021, and the date the FBI conduct[s] a search for responsive records." Def.'s Statement of Undisputed Material Facts ("Def.'s Facts") ¶ 4, ECF No. 16-1.[1] Less than two weeks later, the FBI rejected the request and stated its position that the request was "improper . . . because the FBI's Central Records System is not arranged in a manner that allows for retrieval of information in the form specified in the FOIA Request." *Id.* ¶ 6. The FBI provided an email address PPSA could contact "to ascertain how to reasonably describe its request." *Id.* ¶ 7. PPSA timely appealed to the OIP but did not receive a response to that appeal. *Id.* ¶ 10; Compl. ¶¶ 24–25.

In July 2024, PPSA filed its Complaint against the DOJ, the parent agency of the FBI, alleging a FOIA violation. *See* Compl. The OIP accordingly closed PPSA's appeal in August 2024. Def.'s Facts ¶ 12. In November 2024, the FBI issued a *Glomar* response[2] informing PPSA that the FBI "could neither confirm nor deny the existence of records responsive to Plaintiff's request pursuant to FOIA Exemptions 1, 3, and 7(E)." Decl. of Michael G. Seidel ("Seidel Decl.") ¶ 11, ECF No. 16-2. Defendant moved for summary judgment, arguing that

---

[1] In ruling on this motion for summary judgment, the Court assumes the truth of all uncontested facts identified in the parties' Statements of Undisputed Material Facts and Responses. *See* Local Civ. R. 7(h)(1); ECF Nos. 16-1, 18-2, 19-1.

[2] "*Glomar*" refers to a research ship that was the subject of a FOIA action in which the Central Intelligence Agency refused to confirm or deny that it had documents regarding an alleged operation involving that ship. *See Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976).

PPSA's FOIA request was invalid and that, in the alternative, the FBI's *Glomar* response was proper.  Def.'s Mot. Summ. J. ("Def.'s MSJ") at 1–2, ECF No. 16.  PPSA cross-moved for summary judgment, responding that it had reasonably described the requested records, that the FBI's blanket *Glomar* response was improper because the FBI has acknowledged that responsive records exist in a public report, and that the FBI failed to justify its reliance on the invoked FOIA Exemptions.  Pl.'s Mem. Supp. Cross-Mot. Summ. J. & Opp'n ("Pl.'s Opp'n") at 1, ECF No. 18-1.  The motions are now fully briefed and ready for the Court's consideration.

### III.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Because FOIA cases do not ordinarily involve disputed facts, they 'are typically and appropriately decided on motions for summary judgment.'"  *Project for Priv. & Surveillance Accountability, Inc. v. Nat'l Sec. Agency* ("*PPSA III*"), No. 22-cv-1812, 2024 WL 68244, at *2 (D.D.C. Jan. 5, 2024) (quoting *Moore v. Bush*, 601 F. Supp. 2d 6, 12 (D.D.C. 2009)).

"FOIA generally requires federal agencies to disclose their records upon request unless those records fall within one of the statute's nine exemptions."  *PPSA IV*, 143 F.4th at 508 (citing 5 U.S.C. § 552(a)–(b)).  "The agency bears the burden of establishing that the claimed exemption supports its response."  *Id.* at 512 (citing 5 U.S.C. § 552(a)(4)(B)).  "To withhold information under a FOIA exemption, an agency usually must 'acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for withholding that information.'"  *Id.* at 508 (quoting *Knight First Amend. Inst. at Columbia Univ. v. CIA*, 11 F.4th 810, 813 (D.C. Cir. 2021)).

But in some cases, "merely acknowledging the existence of responsive records" could harm an interest protected by an exemption. *People for the Ethical Treatment of Animals v. NIH* ("*PETA*"), 745 F.3d 535, 540 (D.C. Cir. 2014). "In that event, an agency can issue a *Glomar* response, refusing to confirm or deny its possession of responsive documents." *Id.* A *Glomar* response is thus available to an agency "if the fact of the existence or nonexistence of agency records falls within a FOIA exemption." *Id.* (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)). "In considering a *Glomar* response, courts apply the 'general exemption review standards established in non-*Glomar* cases.'" *Knight First Amend. Inst.*, 11 F.4th at 813 (quoting *Wolf*, 473 F.3d at 374). Courts can determine whether an agency has adequately supported its *Glomar* response based on affidavits alone. *PPSA IV*, 143 F.4th at 512. The affidavits must be "reasonably specific" and "not substantially called into question by contrary record evidence or evidence of agency bad faith," and the agency's explanation must be "logical or plausible." *Schaerr v. U.S. Dep't of Just.* ("*Schaerr II*"), 69 F.4th 924, 929 (D.C. Cir. 2023). And when national security is implicated, courts "defer[ ] to executive affidavits predicting harm to national security," and "exercise 'great caution' before compelling an agency to disclose protected information." *PPSA IV*, 143 F.4th at 512 (first quoting *ACLU v. Dep't of Def.* ("*ACLU*"), 628 F.3d 612, 624 (D.C. Cir. 2011); and then quoting *Schaerr II*, 69 F.4th at 929). Thus, in those cases, "the government's burden is a light one." *ACLU*, 628 F.3d at 624.

## IV.  ANALYSIS

The Court first analyzes whether PPSA's FOIA request was reasonably described, and then whether the FBI's blanket *Glomar* response was appropriate. On the first issue, the Court finds that the FBI's objections to the wording of PPSA's requests are meritless and that PPSA reasonably described the requested records. On the second issue, the Court finds that the FBI's

*Glomar* response was appropriate based on Exemptions 1 and 3.  Lastly, the Court explains why PPSA's distinction between operational and policy documents is inapt in this context. Accordingly, the Court grants the FBI's motion for summary judgment and denies PPSA's cross-motion.

## A.  Whether the Request was Reasonably Described

As a preliminary issue, the Court considers whether PPSA's FOIA request was reasonably described, such that it triggered a duty for the FBI to respond.  The FOIA statute requires that "any request for records . . . reasonably describe[] such records."  5 U.S.C. § 552(a)(3)(A).  Otherwise, an agency has no obligation to release nonexempt records.  *See Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 583 (D.C. Cir. 2020).  "A request reasonably describes records if 'the agency is able to determine precisely what records are being requested.'"  *Id.* (quoting *Kowalczyk v. Dep't of Just.*, 73 F.3d 386, 388 (D.C. Cir. 1996)).  The description must "be sufficient [to enable] a professional employee of the agency who was familiar with the subject area of the request to locate the record with a reasonable amount of effort."  *Am. Ctr. for L. & Just. v. U.S. Dep't of Homeland Sec.*, 573 F. Supp. 3d 78, 81–82 (D.D.C. 2021) (alteration in original) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 545 n.36 (D.C. Cir. 1990)).  And in determining which records are requested, the agency "has a duty to construe [the] FOIA request liberally."  *Inst. for Just. v. IRS*, 941 F.3d 567, 572 (D.C. Cir. 2019) (quoting *Nation Mag., Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995)).

PPSA contends that the FBI waived any argument based on whether the request was reasonably described by failing to plead this argument as an affirmative defense.  *See* Pl.'s Opp'n at 4–5.  But PPSA's conception of what constitutes an "affirmative defense" under Rule 8(c)(1)

appears excessively broad.  *See id.*  FOIA requires that a requester "reasonably describe[]" the requested records.  5 U.S.C. § 552(a)(3)(A).  Here, PPSA pleaded this element of its claim when it alleged that its "request reasonably described the requested records."  Compl. ¶ 22.  The FBI issued a general denial and pleaded that it had not violated FOIA by rejecting PPSA's request. *See* Def.'s Answer at 6, ECF No. 9.  Thus, even accepting PPSA's point that an affirmative defense includes "any 'assertion of facts and arguments that, if true, will defeat the plaintiff's . . . claim, even if all the allegations in the complaint are true,'" the FBI need not assert an affirmative defense to contest PPSA's allegation that its request is reasonably described.  *See* Pl.'s Opp'n at 4–5 (quoting *Defense*, Black's Law Dictionary (12th ed. 2024)).  Moreover, PPSA cites no case in which a court deemed this argument waived for failure to plead it specifically. *See id.*; Pl.'s Reply Supp. Cross-Mot. Summ. J. ("Pl.'s Reply") at 2–3, ECF No. 23. Accordingly, the Court sees no reason why a defendant cannot argue at the summary judgment stage that a FOIA request is not reasonably described, even if it did not plead that as an affirmative defense.

Returning to the underlying issue, however, the Court agrees with PPSA that its request is reasonably described and will not grant the FBI summary judgment on this basis.  The FBI first faults PPSA for using the word "all" in its request and suggests that doing so is "improper as a matter of law."  *See* Def.'s MSJ at 8; Def.'s Combined Opp'n & Reply ("Def.'s Reply") at 4, ECF No. 19.  "The phrase 'any and all' is capacious . . . [b]ut requests for all documents are neither inherently unreasonable nor uncommon."  *Am. Ctr. for L. & Just.*, 573 F. Supp. 3d at 85. This makes sense, as a request for "some" documents discussing a given topic would not enable the agency to identify precisely the records being sought.  The case on which the FBI primarily relies for its proposition does not announce any such bright-line rule.  *See* Def.'s MSJ at 8 (citing

*SAI v. Transportation Sec. Admin.*, 315 F. Supp. 3d 218 (D.D.C. 2018)).  Rather the court there rightly concluded that the description was overbroad and lacked specificity because it requested "all 'policy and/or procedures documents,' past and present, including all 'Management Directives, Standard Operating Procedures, Operations Directives, Security Directives, Emergency Amendments, Information Circulars, Memoranda, Handbooks, Letters, Bulletins, and Guidance.'" *SAI*, 315 F. Supp. 3d at 249.  Thus, the court was concerned by the scope of the category of documents requested, and not because the request sought "all" documents within that broad category.  *See id.*

True, a request for "all" documents may result in a high volume of responsive documents, such that the production would be burdensome, but here it is "[u]ndisputed that the Bureau has not, at this stage, argued that Plaintiff's FOIA request is unduly burdensome."  Def.'s Resp. to Pl.'s Statement of Undisputed Material Facts ("Def.'s Resp.") ¶ 27, ECF No. 19-1.  Moreover, the request's use of the word "discussing" would tend to limit the volume of responsive documents, especially in comparison to a more expansive phrase like "relating to."  *Gun Owners of Am., Inc. v. FBI*, 594 F. Supp. 3d 37, 51 (D.D.C. 2022) (comparing "the broad phrase 'related to'" with the narrower modifiers "'discussing' or 'containing an analysis of'").  Thus, the Court concludes that the request here is not unduly broad as to be unreasonably described.

Second, the FBI posits that the use of the word "attendees" is overly broad and vague because it could concern an unspecified number of attendees and an unspecified number of Black Lives Matter events.  *See* Def.'s MSJ at 9; Def.'s Reply at 3.  PPSA's word choices are not vague, and the FBI's supposed confusion is unconvincing.  PPSA has been clear since its initial correspondence containing its FOIA request that it was interested in the FBI's use of "FISA authority to engage in politically motivated surveillance."  Compl. Ex. 1.  The FBI's concern

with whether the word "attendees" encompasses event speakers or "members of the public who were outside the security perimeter for the actual event but still were able to observe" seems manufactured.  *See* Def.'s Reply at 3.  Read in the context of investigating politically motivated surveillance, the request clearly seeks records discussing the use of FISA authority to investigate individuals in their capacity as attendees of these events.  Thus, the relevant inquiry is whether the FBI considered the person an event attendee.  Similarly, to the extent the FBI did not consider an event a Black Lives Matter event, then that too would fall beyond the scope of PPSA's request.  The Court concludes that PPSA's description would enable an FBI employee familiar with the subject area to locate these records with a reasonable amount of effort, so the request is reasonably described.  *See Am. Ctr. for L. & Just.*, 573 F. Supp. 3d at 81–82.  Accordingly, the Court proceeds to analyze whether the FBI's blanket *Glomar* response was proper.

## B.  Adequacy of the FBI's Blanket *Glomar* Response

The Court is persuaded that the FBI's blanket *Glomar* response to PPSA's FOIA request was adequate.  To reach that conclusion, the Court first analyzes PPSA's argument that the FBI has waived its right to issue a *Glomar* response by acknowledging the use of Section 702 authority in public records.  Because that disclosure is incongruent with the requests here, the Court concludes that the FBI has not waived its *Glomar* response and proceeds to analyze it on the merits.  The Court finds that the FBI's declaration supports its *Glomar* response based on Exemptions 1 and 3.  Because the Court rests its decision on these Exemptions, it does not separately analyze Exemption 7(E).  *See Larson v. Dep't of State*, 565 F.3d 857, 862–63 (D.C. Cir. 2009) ("[A]gencies may invoke the exemptions independently and courts may uphold agency action under one exemption without considering the applicability of the other.").  Lastly,

the Court explains why PPSA's framing of its request as encompassing "policy documents" that fall outside the scope of Exemptions 1 and 3 is unavailing here.

### 1. Waiver by Prior Disclosure

In FOIA cases generally, "a plaintiff asserting a claim of prior disclosure must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983). As applicable here, "[a]n agency waives any right to make a *Glomar* response by disclosing whether responsive records exist." *Knight First Amend. Inst.*, 11 F.4th at 815. "To establish official acknowledgment, a plaintiff must identify information in the public domain that (1) matches the information requested, (2) is as specific, and (3) has 'been made public through an official and documented disclosure.'" *Id.* (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990)). "Prior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure." *Wolf*, 473 F.3d at 378.

Recall that PPSA's FOIA request here was for:

1. All records discussing the use of Section 702 or other FISA authority to surveil, collect information related to, or otherwise investigate any person or group of persons listed below:
   - Attendees of President Trump's "Save America Rally" on January 6, 2021;
   - Attendees at Black Lives Matter protests or other Black Lives Matter events in Washington, D.C. in 2021.

Compl. Ex. 1. For its waiver argument, PPSA primarily relies on the Semiannual Assessment of Compliance with Procedures and Guidelines Issued Pursuant to Section 702 of the Foreign Intelligence Surveillance Act, Submitted by the Attorney General and the Director of National

Intelligence[3] for the Reporting Period of June 1, 2021 through November 30, 2021, which was

published in March 2023 ("Semiannual Assessment"), Pl.'s Opp'n Ex. D, ECF No. 18-6. PPSA

identifies two relevant paragraphs in the Semiannual Assessment:

> [DOJ's National Security Division] identified multiple instances in which queries were conducted relating to individuals present during the 06 January 2021 breach of the U.S. Capitol ("Capitol Breach"), and the query terms were misidentified as non-United States person query terms. These incidents represented both a misapplication of the query standard (discussed in greater detail below) and a misapplication of the United States person presumptions in the querying procedures.

> . . . .

> The vast majority of these noncompliant queries sought information regarding civil unrest and protests following the death of George Floyd or regarding the Capitol Breach. For example, in one instance a Task Force Officer conducted approximately [redacted] queries of [redacted] email addresses in unminimized Section 702-acquired information in response to a lead in which a complainant provided the name of an individual that allegedly participated in the Capitol Breach.

Semiannual Assessment, Ex. D, at 46–47. Contrary to PPSA's assertion that the Semiannual

Assessment "publicly discusses FISA surveillance of the very events about which PPSA sought

records," the differences between the requests and disclosure are meaningful. *See* Pl.'s Opp'n

at 14.

Most importantly, the events at issue are not the same. PPSA's request concerns the Save

America Rally and Black Lives Matters events in D.C. in 2021. Compl. Ex. 1. In contrast, the

Semiannual Assessment discusses the breach of the U.S. Capitol and "civil unrest and protest

following the death of George Floyd." Semiannual Assessment, Ex. D, at 46–47. Even if some

Save America Rally attendees may have also breached the Capitol, President Trump's rally and

---

[3] The FBI does not dispute that this disclosure by the Department of Justice, the FBI's parent agency, is attributable to the FBI for FOIA purposes. *See* Pl.'s Resp. & Counter-Statement of Material Facts Not in Dispute ("Pl.'s Facts") ¶ 29, ECF No. 18-2; Def.'s Resp. ¶ 29.

the Capitol breach were distinct events, so the disclosure does not match PPSA's first bulleted category. The second category has similar issues; even if some protests following the death of George Floyd were Black Lives Matter events that occurred in D.C. during 2021, nothing in the disclosure addresses surveillance of those events or their participants specifically. PPSA's requests are distinguishable from the FBI's disclosure on this basis, regardless of PPSA's characterization of this plain reading as "hairsplitting." *See* Pl.'s Reply at 6; *Leopold v. CIA*, 987 F.3d 163, 171 (D.C. Cir. 2021) ("To establish official acknowledgment our precedents require certainty, not assumptions . . . .").

And PPSA's reliance—for the first time in its reply brief—on another document, the Privacy and Civil Liberties Oversight Board's 2023 Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act ("PCLOB Report"), does not change the Court's conclusion. *See* Pl.'s Reply at 8 (citing Priv. & Civ. Liberties Oversight Bd., Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act 150 (2023), https://documents.pclob.gov/prod/Documents/OversightReport/d21d1c6b-6de3-4bc4-b018-6c9151a0497d/2023%20PCLOB%20702%20Report,%20508%20Completed,%20Dec%203,%202024.pdf [https://perma.cc/5AQ5-YJ2X]). That document discusses queries on individuals "arrested in connection with the Black Lives Matter protests," but does so without reference to where or when those protests or arrests occurred. *See* PCLOB Report at 150. The sentence after the one that mentions "Black Lives Matter protests" discusses specific non-compliant queries relating to people arrested by the D.C. Metropolitan Police Department in connection with "protests following the death of George Floyd," but those queries occurred in June 2020, so they are outside the scope of PPSA's timeframe. *See id.* at 150–51.

Put simply, neither the Semiannual Assessment nor the PCLOB Report addresses the existence of documents that necessarily fall within the scope of PPSA's FOIA request; therefore, neither of these documents confirms the existence of FBI documents responsive to PPSA's request and, therefore, do not waive the FBI's ability to issue a *Glomar* response. The D.C. Circuit has "repeatedly rejected the argument that the government's decision to disclose some information prevents the government from withholding other information about the same subject." *PPSA IV*, 143 F.4th at 515 (quoting *ACLU*, 628 F.3d at 625). Requiring a strict congruence enables the government to make disclosures while properly protecting information that should not be made public. *See Wolf*, 473 F.3d at 378 ("The insistence on exactitude recognizes 'the Government's vital interest in information relating to national security and foreign affairs.'" (quoting *Pub. Citizen v. Dep't of State*, 11 F.3d 198, 203 (D.C. Cir. 1993))). Applying the strict test for prior disclosure here, the FBI has not waived its *Glomar* response.

Because the Court concludes that the FBI has not waived its *Glomar* response, the Court next considers whether the FOIA Exemptions that the FBI invoked justify its response. The Court analyzes Exemptions 1 and 3, in turn.

## 2. Exemption 1

FOIA's Exemption 1 applies to "matters that are specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive order . . . ." 5 U.S.C. § 552(b)(1). The FBI invokes Executive Order 13,526, "which allows certain categories of information to be classified when . . . an 'original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security' and the agency 'is able to identify or describe th[at] damage.'" *Schaerr II*,

69 F.4th at 929 (second alteration in original) (quoting Classified National Security Information, Exec. Order No. 13,526 § 1.1(a)(4), 75 Fed. Reg. 707, 707 (Jan. 5, 2010)).  One of those categories of classifiable information is "intelligence activities (including covert action), intelligence sources or methods, or cryptology."  *See* Exec. Order No. 13,526 § 1.4(c), 75 Fed. Reg. at 709.

Here, the FBI has submitted the declaration of Michael G. Seidel, the FBI's Section Chief of the Record/Information Dissemination Section of the Information Management Division.  *See* Seidel Decl. ¶ 1.  PPSA does not dispute that Mr. Seidel has original classification authority.  *See id.* ¶¶ 2, 19; Def.'s MSJ at 11.  Mr. Seidel "determined that the existence or nonexistence of intelligence records responsive to Plaintiff's FOIA request is a classified fact because any such acknowledgement would tend to confirm or disprove that the FBI is conducting or has conducted counterintelligence investigations of particular targets or activities during a specific time period."  Seidel Decl. ¶ 19.  According to Mr. Seidel, "[o]nce the fact of an intelligence activity, method, or source's use or non-use in a certain situation or against a certain target is discovered, its continued successful use is seriously jeopardized."  *Id.* ¶ 22.  This explanation makes sense.  The FBI's acknowledgement of the use or non-use of Section 702 to investigate particular event attendees could enable adversaries to better understand "the nature of the FBI's intelligence interests, priorities, activities, and methods," including whether the FBI used Section 702-intelligence—which generally cannot be collected by targeting a person located in the United States—to investigate particular individuals or groups who attended specific events located in the United States.  *See id.* ¶¶ 14, 24; 50 U.S.C. § 1881a(b)(1).  Whether this method was used could then disclose potential strengths or weaknesses of FBI surveillance, or even tip off foreign adversaries as to whether they have been a target of Section 702 surveillance.  The Court thus

finds logical and plausible the FBI's explanation of potential adverse effects of disclosure on national security.

PPSA's arguments to the contrary largely derive from its mistaken view that *Glomar* responses are improper unless the agency first searches for responsive records. *See* Pl.'s Opp'n at 15–16. PPSA's motion repeatedly faults the FBI for issuing a "searchless *Glomar*" response. *See* Pl.'s Opp'n at 18, 20, 23. The D.C. Circuit has soundly rejected PPSA's argument as "foreclosed by circuit precedent." *PPSA IV*, 143 F.4th at 511. PPSA acknowledges this precedent, but resists its implications here. *See* Pl.'s Reply at 11. For example, PPSA argues that "to categorically claim Exemption 1, the FBI first must show not only that the relevant records are eligible for classification, but also that they have *been* classified, which the FBI has not done." *Id.*; Pl.'s Opp'n at 18. In tandem, PPSA argues that "EO 13,526 . . . requires classification to be 'accomplished on a document-by-document basis[.]'" Pl.'s Opp'n at 18 (second alteration in original) (quoting Exec. Order No. 13,526 § 1.7(d), 75 Fed. Reg. at 711).

These arguments are unavailing. Taken together, PPSA purports to accept that the FBI need not search for records before issuing a *Glomar* response, but argues that, to issue that response, the FBI must have gone document-by-document to review and classify responsive documents. Yet searching for those documents is precisely what the D.C. Circuit has told PPSA agencies are *not* required to do. *PPSA IV*, 143 F.4th at 511. Mr. Seidel, an original classification authority, has declared that knowledge of the existence or non-existence of the requested information is itself confidential. *See id.* at 517 ("[T]he Executive Order expressly allows for the classification of information that is knowledge, and not just information that is in the form of markable documentary material."). No search is necessary to confirm this.

PPSA also argues that there may exist policy documents that are responsive to its FOIA request and not protected by a FOIA exemption. *See* Pl.'s Opp'n at 19. The Court is unpersuaded that the present FOIA request encompasses such general, unexempted policy documents, as discussed in greater detail below.

As a final resistance, PPSA invokes the Executive Order's prohibition on "classifying information to '(1) conceal violations of law, inefficiency, or administrative error; [or] (2) prevent embarrassment to a person, organization, or agency.'" Pl.'s Opp'n at 20 (quoting Exec. Order 13,526 § 1.7(a), 75 Fed. Reg. at 710). Mr. Seidel specifically declared that his classification determination was not made for either of those reasons. *See* Seidel Decl. ¶ 24. PPSA acknowledges its burden to produce credible evidence of concealment, but points only to the same Semiannual Assessment discussed above. *See* Pl.'s Opp'n at 20–21; Pl.'s Reply at 13.

PPSA has not met its burden to produce evidence of concealment. The FBI, through its parent agency the DOJ, acknowledged "noncompliant queries" of Section 702-acquired information, but that acknowledgement does not support speculation that the FBI's purpose for classifying the intelligence activities at issue here is to conceal error, particularly where it has publicly acknowledged those querying errors. And speculation that the FBI may have submitted Mr. Seidel's declaration to cover up other errors is "either too generalized or too attenuated from the specific classification decisions at issue to constitute the kind of 'tangible evidence of bad faith' . . . required to overcome agency affidavits." *See Schaerr II*, 69 F.4th at 931 (quoting *Carter v. U.S. Dep't of Com.*, 830 F.2d 388, 393 (D.C. Cir. 1987)). Rather, Mr. Seidel's declaration reasonably explains the national security risks of disclosing the confidential information at issue here, so the FBI's *Glomar* response is adequately supported.

3.  Exemption 3

FOIA's Exemption 3 applies to "matters that are specifically exempted from disclosure by statute . . . if that statute . . . (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld . . . ."  5 U.S.C. § 552(b)(3).  Here, the FBI relies on the National Security Act, 50 U.S.C. § 3024(i)(1), which provides that "[t]he Director of National Intelligence [("DNI")] shall protect, and shall establish and enforce policies to protect, intelligence sources and methods from unauthorized disclosure."[4]  PPSA correctly notes the "'considerable overlap' between § 3024(i)(1) (formerly 50 U.S.C. § 403) and Section 1.4 of EO 13,526."  Pl.'s Opp'n at 22 (quoting *Gardels v. CIA*, 689 F.2d 1100, 1107 (D.C. Cir. 1982)).  For similar reasons as for Exemption 1, the Court finds the FBI's invocation of Exemption 3 adequately supported.  Mr. Seidel explained that the DNI has promulgated a Directive to protect "national intelligence and intelligence sources and methods and activities," and further declared that "acknowledging the existence or nonexistence of records responsive to Plaintiff's request could reasonably be expected to reveal intelligence activities, sources, and methods utilized by the FBI, thus compromising the national security interests of the United States."  Seidel Decl. ¶¶ 27–28; *see Schaerr II*, 69 F.4th at 930 (recognizing "that the mere acknowledgment of intelligence sources and methods may implicate the protections of the [National Security] Act").

PPSA suggests that the FBI is prohibited from issuing a blanket *Glomar* response based on the National Security Act because the Act instructs the DNI to establish and implement requirements for the "[p]reparation of intelligence products in such a way that source

---

[4] The FBI does not dispute that it is "a member of the Intelligence Community, of which the Office of the Director of National Intelligence is the 'head.'"  *See* Pl.'s Facts ¶ 30 (citations omitted); Def.'s Resp. ¶ 30.

information is removed to allow for dissemination at the lowest level of classification possible or in unclassified form to the extent practicable." 50 U.S.C. § 3024(i)(2)(C); Pl.'s Opp'n at 23; Pl.'s Reply at 14. But that directive to the DNI says nothing about when lower levels of classification may not be possible or practicable. PPSA fails to explain how that statute has been implemented in a way that would require the FBI to maintain information in PPSA's desired format. Nor does PPSA offer a limiting principle for its theory, which would appear to prohibit *Glomar* responses based on the National Security Act categorically. The FBI is correct to fault PPSA for citing no caselaw for this novel rule, especially where courts have previously upheld *Glomar* responses under Exemption 3 based on the Act. *See Schaerr II*, 69 F.4th at 930; *PPSA III*, 2024 WL 68244, at \*7. Like the FBI's *Glomar* response based on Exemption 1, its *Glomar* response based on Exemption 3 is sufficiently supported by Mr. Seidel's declaration explaining why PPSA's request concerns intelligence sources and methods that the National Security Act shields from disclosure.

### 4. Policy Documents

Finally, PPSA argues that the FBI's blanket *Glomar* response is improper because "there are many types of responsive records FOIA does not protect"—specifically, "policy documents." *See* Pl.'s Opp'n at 19; Pl.'s Reply at 12 n.5. In previous litigation involving blanket *Glomar* responses by intelligence agencies to PPSA's FOIA requests, this Court has recognized a distinction between requests for "operational documents" and "policy documents." *See Project for Priv. & Surveillance Accountability, Inc. v. U.S. Dep't of Just.* ("*PPSA II*"), 633 F. Supp. 3d 108, 115 (D.D.C. 2022); *PPSA III*, 2024 WL 68244, at \*8. Those decisions drew on the D.C. Circuit's reasoning in *PETA*, 745 F.3d at 544–45. A brief discussion of these cases illustrates why the distinction between "operational" and "policy" records is inapt here.

In *PETA*, an animal rights non-profit "requested records concerning NIH investigations of animal abuse at a university research lab, and specifically sought documents related to any investigations into complaints filed against three identified researchers." 745 F.3d at 538. The NIH issued *Glomar* responses, invoking Exemption 7(C) "which permits withholding law enforcement information or records if disclosure could entail an unwarranted invasion of personal privacy." *Id.* The D.C. Circuit held that the NIH's *Glomar* response was proper "as to any documents that would confirm the existence of an investigation into the three named researchers." *Id.* at 544. But construing the request liberally, the panel interpreted PETA's FOIA request as also encompassing "documents showing that NIH responded to complaints about the three researchers by conducting an investigation that did not target the researchers themselves." *Id.* The panel reasoned that "[a]cknowledging an investigation that did *not* target the researchers would serve to advance that public interest" in shedding light on NIH's investigatory processes "without unduly compromising the researchers' privacy interests" that Exemption 7(C) protects. *Id.* at 545. Thus, the panel found that the NIH's blanket *Glomar* response was improper. *Id.*

Drawing from this precedent, this Court rejected the FBI's blanket *Glomar* response in a previous case filed by PPSA. *See PPSA II*, 633 F. Supp. 3d at 111. That case involved the "unmasking" of the identities of members of Congress from information obtained using FISA authority where the U.S. persons' identities had previously been masked pursuant to required "minimization procedures." *See id.* at 112. Specifically, the FOIA request sought from the FBI "[a]ll correspondence between individual Senators or Congressman and any agency, or between an agency and Congressional Leadership and/or either or both Congressional intelligence committees, concerning the unmasking of Congressmen or Senators, including but not limited to

correspondence from or to" specific members of Congress. *Id.* at 113. The Court found that *Glomar* responses were appropriate for "FISA-obtained or -derived 'operational documents' which reveal the FBI's operations, any fruits of such operations, and/or any resulting congressional unmasking" under Exemptions 1 and 3. *See id.* at 117–20. But the Court held that the FOIA request also sought "'policy documents' which discuss congressional unmasking as a matter of legislative interest, policy, or oversight." *Id.* at 117, 121. The Court hypothesized that such policy documents could include "a letter from a member of Congress informing the FBI that she contemplated enshrining [unmasking procedures] by statute, or an exchange between Congress and the FBI where Congress solicited the FBI's views on unmasking policies in light of media reports on the topic." *Id.* at 121. As relevant to Exemptions 1 and 3, the Court found that the FBI acknowledging the existence of policy documents would reveal, at most, "Congress's interest in this field but not necessarily uncover anything about the FBI's activities or capabilities." *Id.* at 122. And the Court further explained that "the existence of 'policy documents' would not necessarily disclose any law enforcement procedure, technique, or guideline that would risk circumvention of the law under Exemption 7(E), because acknowledging *the existence of congressional inquiries* would not necessarily reveal anything about the FBI's operations themselves, nor would it necessarily enable a wrongdoer to break the law or avoid detection." *Id.* (emphasis added). As this reasoning implicates, the distinction between "operational" and "policy" documents was largely rooted in the request's emphasis on "'extra-agency correspondence' between Congress and the FBI that [was] 'one or more degrees removed from actual FISA activities.'" *See id.* at 121–22.

Two years later, this Court again recognized the applicability of an operational-versus-policy document dichotomy in another case involving PPSA and multiple intelligence agencies.[5] *PPSA III*, 2024 WL 68244, at *1.  There, PPSA requested "[a]ll documents, reports, memoranda, or communications regarding the obtaining, by any element of the intelligence community from a third party in exchange for anything of value, of any covered customer or subscriber record or any illegitimately obtained information regarding [145 specifically-named current and former members of Congress]."  *Id.* (alteration in original).  Drawing on *PETA* and *PPSA II*, the Court explained that "an agency may issue a blanket *Glomar* response . . . only when 'the circumstances justify a *Glomar* response' for *all* categories of responsive records."  *Id.* at *9 (alteration in original) (quoting *PPSA II*, 633 F. Supp. 3d at 122).  The Court again found that the request sought policy documents that would fall outside the scope of Exemptions 1 and 3.  *Id.* at *9–10.  The Court reasoned that "it does not require immense creativity to imagine records that would fit within the scope of PPSA's request without implicating the national security concerns raised by Defendants" such as "a letter from a member of Congress to the [National Security Agency ("NSA")] inquiring as to whether the NSA had purchased commercially available information on any of the listed Senators or Congresspeople."  *Id.* at *9.  This hypothetical letter "would fall within the scope of PPSA's request while simultaneously not revealing whether the NSA had, in fact, purchased such information or whether the NSA had a particular interest in surveilling the individual."  *Id.*  Thus, the Court again found that a blanket *Glomar* response was improper as to these documents.  *Id.* at *10.

---

[5] The Court notes that, in light of the D.C. Circuit's decision in *PPSA IV*, the defendants in *PPSA III* have moved for reconsideration of the Court's decision denying in part their motion for summary judgment.  Def.'s Mot. Recons., *Project for Priv. & Surveillance Accountability, Inc. v. Nat'l Sec. Agency*, No. 22-cv-1812 (D.D.C. Aug. 22, 2025), ECF No. 57.  That motion is currently pending.

Here, PPSA's request is readily distinguishable.  To begin, the use of "policy" in this Court's prior opinions concerned "legislative interest, policy, or oversight."  *See PPSA II*, 633 F. Supp. 3d at 115; *PPSA III*, 2024 WL 68244, at *4.  The Court's focus on extra-agency concerns with the intelligence community's methods as a matter of policy made sense, as the FOIA requests in those cases both concerned members of Congress, with the former requesting communications from Congress members expressly.  *See PPSA II*, 633 F. Supp. 3d at 113; *PPSA III*, 2024 WL 68244, at *1.  In contrast, the requests here make no mention of any government element outside the FBI.  *See* Compl. Ex. 1.  Thus, PPSA's suggestion that its request in this case includes hypothetical "congressional letters" makes little sense.  *See* Pl.'s Opp'n at 22.

Moreover, PPSA argues that its request for policy documents would include "internal FBI policies" regarding protests.  *See* Pl.'s Reply at 12–13 n.5.  But here, information on how the FBI surveils particular protests, or its methods of deciding how to investigate attendees of particular events, is the very information Mr. Seidel declared is classified and implicates national security, invoking Exemptions 1 and 3.  Unlike the requests for documents that were degrees removed from FISA activity in the Court's prior opinions, here, PPSA seeks information on FISA activity directly—specifically the targeting of particular events using Section 702.[6]  That intelligence activity is the type of information Exemptions 1 and 3 are meant to protect.

In sum, PPSA's position that it requested "policy documents" is not a one-size-fits-all argument that requires the agency to conduct a search for documents that are not reasonably

---

[6] Though there may be some category of high-level policy documents that exist concerning surveillance of protests broadly, *see* Pl.'s Reply at 12 n.5, the Court does not read PPSA's targeted requests as seeking those general policy documents.  Like the D.C. Circuit's decision in *PPSA IV*, where the court concluded the requests did not encompass general policy documents because the requests concerned only "named individuals during certain years," here, the request is limited to the use of FISA to surveil attendees of specific events in 2021, and not surveillance of protests generally.  *See* 143 F.4th at 514.

expected to fall within the scope of a request and beyond the scope of an Exemption supporting a *Glomar* response.  Because PPSA's request seeks those documents at the core of the FBI's sensitive FISA activities and operations, PPSA's framing of its request as seeking "policy documents" is unavailing here.  Thus, Defendant is entitled to summary judgment.

## V.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 16) is **GRANTED**; and Plaintiff's Cross-Motion for Summary Judgment (ECF No. 18) is **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  November 20, 2025                                     RUDOLPH CONTRERAS
                                                             United States District Judge